NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0018n.06

No. 15-1359

FILED
Jan 11, 2016
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Cyber Solutions International, LLC, )
)
    Plaintiff-Appellant, )    ON APPEAL FROM THE
) UNITED STATES DISTRICT
v. ) COURT FOR THE WESTERN
) DISTRICT OF MICHIGAN
Pro Marketing Sales, Inc., )
) OPINION
    Defendant-Appellee. )
)
_____ )

**BEFORE: MOORE, CLAY, and GILMAN, Circuit Judges.**

**RONALD LEE GILMAN, Circuit Judge.** This case involves a dispute between two competing lenders as to which one is entitled to a microchip encryption technology developed by their mutual borrower Priva Technologies, Inc. (Priva) that is now in Chapter 7 bankruptcy. The technology in question is known as Tamper Reactive Secure Storage (TRSS). Pro Marketing Sales, Inc. (Pro Marketing) bases its claim on its 2009 Security Agreement with Priva, whereas Cyber Solutions International, LLC (Cyber) bases its competing claim on its 2012 License Agreement with Priva.

Both lenders eventually filed claims seeking declaratory and/or injunctive relief to clarify ownership of the TRSS technology. The district court granted summary judgment in favor of Pro Marketing on the basis that Pro Marketing's Security Agreement gave it a superior claim to the TRSS technology. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

**A.    Priva and the secured loan from Pro Marketing**

Priva is a Delaware corporation that, until recently, developed products to store and protect digital information.   In 2007, Priva began working on a microchip encryption technology known as the Secured Key Storage Integrated Circuit (SKSIC).   Priva required capital to finance the development of this and other products, so it turned to Pro Marketing to obtain a secured loan. The companies executed a document memorializing the loan (the Security Agreement) on April 16, 2009.   This agreement grants Pro Marketing a first-position lien on all of Priva's assets.   It defines the "Collateral" for the loan as

> all types or items of personal property owned by [Priva], whether now owned or hereafter arising or acquired, and wherever located, or in which [Priva] now has or at any time in the future may acquire any right, title or interest, including, without limitation, all of the following property . . . (xv) all Intellectual Property; . . . and (xviii) to the extent not otherwise included, all products and Proceeds of any and all of the foregoing property described above.

The Security Agreement then defines "Intellectual Property" to mean "all rights, priorities and privileges relating to intellectual property . . . , including without limitation the Copyrights, the Copyright Licenses . . . , and all Goodwill associated with or arising in connection with any of the foregoing."    This  agreement  also  limits  Priva's  rights  with  respect  to  the  Collateral. It specifically provides that Priva cannot

> sell, transfer, assign, convey or otherwise dispose of, or extend, amend, terminate or otherwise modify any term or provision of any license of [Priva's] Intellectual Property, other than in the ordinary course of business, or other agreement relating to, any Collateral, any interest therein or any Proceeds thereof, nor waive or release any right with respect thereto, without the prior written consent of [Pro Marketing]; provided, [that Priva] may sell or otherwise dispose of items of Collateral which, individually, do not exceed $50,000 in value.

**B.      Bankruptcy filing and license agreement with Cyber**

Priva's business proved less successful than its owners had hoped.   Its creditors began demanding repayment and, in December 2011, Priva filed a petition in the Bankruptcy Court for the Western District of Michigan for relief under Chapter 11 of the Bankruptcy Code.   Priva's bankruptcy constituted a default under the terms of its Security Agreement, which caused Pro Marketing to begin the process of foreclosing on Priva's assets in March 2012.

In the meantime, Priva worked to develop a bankruptcy reorganization plan and to acquire additional assets with which to pay its debts.   It consequently began negotiating with Cyber, which was interested both in acquiring the SKSIC technology and in hiring Priva to develop additional technology.   The companies eventually signed a Design Service and Intellectual Property License Agreement (the License Agreement) on April 19, 2012.   Pursuant to the License Agreement, Cyber made two $200,000 payments to Priva.   In return for the first payment, Cyber received an exclusive license to the SKSIC technology and, in return for the second payment, it received certain rights in future technologies that Priva developed.

Cyber's rights to the future technologies are defined in Article 5.2 of the License Agreement, which provides that

> [a]ny updates, modifications or improvements to the Licensed Technology [i.e., SKSIC] developed by [Priva] and paid for by [Cyber] shall be the property of [Cyber.]   [Priva] agrees to assign and agrees to assign in the future (when any such updates, modifications, or improvements to the Licensed Technology are first reduced to practice or first fixed in a tangible medium, as applicable) to [Cyber] all right, title and interest in and to any and all updates, modifications, or improvements to the Licensed Technology (and all proprietary rights with respect thereto) whether or not patentable or registrable under copyright or similar statutes, made or conceived or reduced to practice or learned by [Priva], either alone or jointly with others, during the period of Design Services engagement with [Cyber].

The License Agreement thus establishes that all "updates, modifications, or improvements" to the SKSIC technology that Priva developed with Cyber's funding would be assigned to and owned by Cyber.

Finally, the License Agreement acknowledges Pro Marketing's preexisting security interest in Priva's assets. It states that the "SKSIC is subject to certain liens and security interests" and expressly acknowledges that those interests would "continue notwithstanding [Priva's] entry" into the License Agreement.

## C. Bankruptcy proceedings

On June 20, 2012, the bankruptcy court approved Priva's First Amended and Restated Combined Joint Plan of Reorganization and Disclosure Statement (the Reorganization Plan). As part of the Reorganization Plan, the court specifically approved the License Agreement that Priva had executed with Cyber.

Pro Marketing objected to the Reorganization Plan's incorporation of the License Agreement. It argued that the License Agreement was not in the interest of either the bankruptcy estate or of Pro Marketing because the Plan did not secure fair value for the SKSIC technology and because it "usurp[ed]" Pro Marketing's interest in Priva's assets.

The bankruptcy court overruled Pro Marketing's objections. It noted that although "the technology [was] being licensed to [Cyber], that license [was] subordinate to Pro Marketing Sales' superior lien." In addition, the court stated that "if Priva were to default under the terms of the plan such that Pro Marketing could exercise its collateral rights, it would be able to recover . . . the SKSIC technology in whole notwithstanding the license that is being granted as part of this plan." The court thus concluded that the License Agreement did not jeopardize Pro Marketing's security interest, making Pro Marketing's objections unwarranted.

After the Reorganization Plan was approved, Priva continued its operations and began developing a second-generation SKSIC product at the behest of Cyber. These efforts resulted in the completion of a new product known as Tamper Reactive Secure Storage (TRSS). The parties do not dispute that Cyber provided the funding for the TRSS development and that the TRSS technology constitutes an "update, modification, or improvement" of the SKSIC technology.

Cyber and Priva expected TRSS to be a commercial success, but Priva continued to suffer cash shortages and was unable to meet its obligations under the Reorganization Plan. Priva's board of directors accordingly voted in January 2013 to cease operations and allow Pro Marketing to exercise its rights under the Security Agreement. The two companies thereafter arranged for a "friendly foreclosure" on Priva's assets. This resulted in Priva surrendering to Pro Marketing the SKSIC technology, the TRSS technology, and the computers containing Priva's other intellectual property.

Contemporaneously, Priva notified Cyber that it was unilaterally terminating the parties' License Agreement. As grounds for the termination, Priva asserted that Cyber had materially and incurably breached the License Agreement by seeking design services from companies other than Priva.

## D.    District court proceedings

Cyber responded to the above events by filing suit against Priva and Pro Marketing in the United States District Court for the Western District of Michigan. It first requested a declaratory judgment that Cyber had not breached the License Agreement and that the License Agreement remained enforceable. Cyber also sought a declaration that, pursuant to the terms of the License Agreement, it owned the TRSS technology. In connection with this claim, Cyber sought a preliminary injunction to prevent Pro Marketing from disposing of either the SKSIC technology or

the TRSS technology.    It also requested an order requiring Priva and/or Pro Marketing to transfer the TRSS technology to Cyber.

Pro Marketing counterclaimed with its own request for a declaratory judgment.    It asked the district court to declare that Pro Marketing was the rightful owner of both the SKSIC and TRSS technologies and that Pro Marketing was entitled to freely exercise its rights of ownership.

The district court referred Cyber's request for a preliminary injunction to the bankruptcy court.    That court concluded that it should "preserve the status quo" to afford additional time for the bankruptcy estate to determine how best to dispose of the disputed assets.    Cyber's request that the SKSIC and TRSS technologies be transferred to it was denied, but the court granted Cyber's request for a preliminary injunction forbidding Pro Marketing from "taking any . . . steps to sell, market or otherwise dispose" of either technology.

With the injunction in place, the parties returned to the district court.    Pro Marketing subsequently moved for summary judgment on its counterclaim on the ground that the Security Agreement authorized Pro Marketing to foreclose on and then sell or license both the SKSIC and TRSS technologies.    Cyber opposed the motion on various grounds.    Of relevance to this appeal, Cyber argued that its License Agreement with Priva precluded any finding that Pro Marketing had any rights in the TRSS technology.    Cyber also maintained that Pro Marketing had "unclean hands" with regard to its termination of the License Agreement, thus barring Pro Marketing from seeking equitable relief.

The district court rejected Cyber's arguments and granted summary judgment in favor of Pro Marketing.    It thereafter entered an order declaring "that Defendant Pro Marketing Sales lawfully possesses Priva's collateral pursuant to its Security Agreement, and that Pro Marketing is permitted to market, sell and/or license the SKSIC/TRSS technology."

Cyber now appeals the district court's order. It argues that (1) its rights to the TRSS technology are superior to those of Pro Marketing, and (2) the district court erred by refusing to apply the doctrine of unclean hands as a bar to Pro Marketing's request for declaratory relief.

## II. ANALYSIS

### A. Standard of review

Cyber first asserts that the district court erred by granting summary judgment in favor of Pro Marketing on the basis of Pro Marketing's Security Agreement with Priva. We review de novo a grant of summary judgment. *Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc.*, 409 F.3d 342, 346 (6th Cir. 2005). Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 321 (6th Cir. 2012). We construe all disputed facts in the light most favorable to the nonmovant, *id.*, but the parties in the present case largely agree on the relevant facts. Their dispute instead turns on the district court's interpretation of their contractual agreements, which we also review de novo. *See Meridian Leasing*, 409 F.3d at 346.

Cyber next asserts that the district court should have applied the doctrine of unclean hands to preclude Pro Marketing's request for declaratory relief. We review the application of the unclean-hands doctrine under the abuse-of-discretion standard, *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir. 1995), but pure questions of law related to that doctrine are subject to de novo review. *Bonner Farms, Ltd. v. Fritz*, 355 F. App'x 10, 17 (6th Cir. 2009) (citing *Ne. Women's Ctr., Inc. v. McMonagle*, 868 F.2d 1342, 1354 (3d Cir. 1989)).

**B.        Choice of law and rules of contract interpretation**

The district court had jurisdiction pursuant to diversity of citizenship, so we "must apply the choice of law rules of the state in which [the district court] sits."   *Rosen v. Chrysler Corp.*, 205 F.3d 918, 921 n.2 (6th Cir. 2000).   Michigan courts enforce contractual choice-of-law provisions, *Johnson v. Ventra Grp., Inc.*, 191 F.3d 732, 739 (6th Cir. 1999), and the Security Agreement, the License Agreement, and the Reorganization Plan each contain such a provision.

The Security Agreement provides for interpretation under "the laws of the State of New York," so New York law governs that Agreement.   Next, the Reorganization Plan states that both the Plan and any agreements executed in connection with the Plan are to be interpreted under Michigan law.    Because the License Agreement was executed in connection with the Reorganization Plan, Michigan law governs the interpretation of the License Agreement.

Courts in both New York and Michigan begin their interpretation of a contract with the language of the contract itself.   If that language is unambiguous, then the courts will enforce the plain meaning of the contact's terms.   *See, e.g.*, *Russo v. Estee Lauder Corp.*, 856 F. Supp. 2d 437, 460 (E.D.N.Y. 2012) ("Under New York law, the Court must look first to the parties' written agreement to determine the parties' intent and limit its inquiry to the words of the agreement itself if the agreement sets forth the parties' intent clearly and unambiguously." (citation and alterations omitted)); *Harbor Park Mkt., Inc. v. Gronda*, 743 N.W.2d 585, 588 (Mich. Ct. App. 2007) ("The goal of contract interpretation is to first determine, and then enforce, the intent of the parties based on the plain language of the agreement.").

Whenever possible, courts in both jurisdictions read contracts to give effect to all of the contract's terms.   *Zahn v. Kroger Co. of Mich.*, 764 N.W.2d 207, 211 (Mich. 2009) ("All contracts . . . should be construed to ascertain and give effect to the intentions of the parties

and should be interpreted to give a reasonable meaning to all of [their] provisions."); *Smith v. City of Buffalo*, 120 A.D.3d 1588, 1589 (N.Y. App. Div. 2014) ("It is well settled that a contract must be read as a whole to give effect and meaning to every term. Indeed, a contract should be interpreted in a way that reconciles all of its provisions, if possible." (citation and alterations omitted)). The overall goal is to arrive at an interpretation that effectuates the parties' intent. *See, e.g.*, *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 29 n.28 (Mich. 1994) ("The primary goal in the construction or interpretation of any contract is to honor the intent of the parties."); *Frye v. Brown*, 189 A.D.2d 1031, 1033 (N.Y. App. Div. 1993) ("Undoubtedly, the ultimate goal in contract interpretation is realization and effectuation of the parties['] intent . . . .").

**C.     The district court correctly determined that the TRSS technology falls within the scope of Pro Marketing's security interest**

Cyber does not dispute that Pro Marketing has a first-position lien on certain Priva assets. The dispositive issue is therefore whether the TRSS technology falls within the scope of that lien. If so, then the TRSS technology belongs to Pro Marketing; if not, then the TRSS technology belongs to Cyber.

> ***1. The plain meaning of the Security Agreement and the License Agreement support the district court's conclusion that the TRSS technology was part of Pro Marketing's security interest***

Our interpretation begins with the language of the parties' contracts. *See Russo*, 856 F. Supp. 2d at 460; *Harbor Park*, 743 N.W.2d at 588. As noted above, the Security Agreement defines the "Collateral" for Pro Marketing's loan to Priva as "all types or items of personal property owned by [Priva], whether now owned or hereafter arising or acquired, . . . in which [Priva] now has or at any time in the future may acquire any right, title or interest." The Security Agreement thus defines the collateral in terms of ownership. If Priva "own[s]" or

9

"acquires" an item of "personal property," then that property is part of the collateral securing Pro Marketing's loan.

The Security Agreement then states that the "personal property" at issue includes all of Priva's "Intellectual Property" and "Copyrights." These terms broadly include "all rights, priorities and privileges relating to" copyrights, trademarks, patents, and trade secrets, as well as "all mask works fixed in semi-conductor chip products." All of the intellectual-property rights that Priva "owned" or "acquired" at any time were therefore part of the collateral for Pro Marketing's loan.

Cyber argues, however, that the TRSS technology does not fit within this broad definition of the collateral. It relies on Article 5.2 of the License Agreement, which states that if Cyber pays for any "updates, modifications or improvements" to the SKSIC technology, then such updates, modifications, or improvements "shall be the property of [Cyber]." The License Agreement then reiterates that "[Priva] agrees to assign and agrees to assign in the future . . . to [Cyber] all right, title and interest in and to any and all updates, modifications, or improvements" for which Cyber provided funding.

Cyber reads Article 5.2 as instantly and automatically divesting Priva of any and all rights in any update, improvement, or modification to the SKSIC technology. It maintains that, as soon as any such modification of the SKSIC technology was completed, that modification immediately became the property of Cyber. This would mean that any rights in the modifications never passed through Priva's hands and, as a consequence, that Priva "never owned" those rights.

Applying this reading, Cyber notes that it paid for the development of the TRSS technology and that the TRSS is indisputably an "update, modification, or improvement" to the

SKSIC technology. It thus maintains that all rights in the TRSS technology were immediately transferred to Cyber, such that Cyber "owned the TRSS from the moment it came into existence."

This conclusion purportedly removes the TRSS technology from the scope of Pro Marketing's collateral. If the TRSS technology was never owned by Priva, then the technology would fall outside the scope of the Security Agreement's definition of "Collateral," and Pro Marketing's security interest would never have attached.

But Cyber's argument rests on an erroneous reading of the License Agreement. Article 5.2 states that Priva "agrees to assign and agrees to assign in the future" its rights in any modifications to the SKSIC technology. This provision does not instantly grant any rights to Cyber; rather, it implicitly recognizes that Priva *itself* will acquire rights that it must *then* assign. *See, e.g.*, *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1365 (Fed. Cir. 2010) ("[C]ontract language stating that a party 'agrees to assign' reflects a mere promise to assign rights in the future, not an immediate transfer of expectant interests.").

The License Agreement, in other words, acknowledges that Priva might develop certain updates, modifications, or improvements to the SKSIC technology, and that, in doing so, it will acquire the rights to those updates, modifications, or improvements. Only *after* this initial acquisition of the rights does the License Agreement provide for the assignment of those rights to Cyber. The License Agreement therefore contemplates that any rights in updates, modifications, or improvements to the SKSIC technology will in fact first become the property of Priva.

This interpretation is consistent with the parties' intent. Cyber and Priva plainly intended that Article 5.2 would lead to Cyber's eventual acquisition of ownership in the technologies that it paid Priva to develop. Under Michigan law, however, an assignee or transferee acquires no greater rights in the property at issue than the assignor or transferor itself possessed. *See*

*McDonald v. Asset Acceptance LLC*, 296 F.R.D. 513, 526 (E.D. Mich. 2013) (citing *Coventry Parkhomes Condo. Ass'n v. Fed. Nat. Mortg. Ass'n*, 827 N.W.2d 379, 382 (Mich. Ct. App. 2012)) ("[A]n assignee steps into the shoes of the assignor and only acquires such rights as the assignor possessed at the time of assignment."); *Pellerito v. Weber*, 177 N.W.2d 236, 237 (Mich. Ct. App. 1970) ("It is axiomatic that a person cannot convey greater title than he possesses."). Hence, if Priva really did "agree[] to assign and agree[] to assign in the future" its rights in any modifications to the SKSIC technology—as the License Agreement says Priva did—then Priva must have first acquired certain rights in the modifications or technologies to be assigned.

And this places those rights within the scope of Pro Marketing's collateral. Upon the completion of any modification to the SKSIC technology, Priva—however briefly—acquired the rights to that modification. Those rights were then "items of personal property owned . . . or acquired" by Priva, so those rights were included in the Security Agreement's definition of "Collateral." Pro Marketing therefore acquired a security interest in the TRSS technology that was and is superior to Cyber's claim to the technology.

This result should come as no surprise to Cyber because it knew at the time that it executed the License Agreement that such an outcome was possible. The License Agreement itself acknowledges the existence of Pro Marketing's security interest, and the bankruptcy court explicitly noted that Cyber was "assuming the risk" that its rights under the License Agreement "might be disrupted" by Pro Marketing's Security Agreement.

Cyber evidently determined that this risk was worth taking, and it cannot escape the consequences of its decision to enter the License Agreement simply because it is now unhappy with the outcome. *See, e.g.*, *Gogoe v. Wells Fargo Bank N.A.*, No. 14-12502, 2015 WL 5591102, at *10 (E.D. Mich. Sept. 21, 2015) (applying Michigan law) ("The Court . . . is not authorized to

re-write contracts in order to rescue one party or another from a bad deal."); *Eujoy Realty Corp. v. Van Wagner Commc'ns, LLC*, 4 N.E.3d 336, 343 (N.Y. 2013) ("Courts will give effect to the contract's language and the parties must live with the consequences of their agreement.").

To rebut the above interpretation of the License Agreement, Cyber cites Article 7 of the Security Agreement, which provides that Priva must defend its title to Pro Marketing's collateral "against the claims and demands of all other persons." Cyber then alleges that, during the bankruptcy proceedings, Priva did not vigorously defend its rights to the TRSS technology, with the implication that Priva must not have considered the TRSS technology to be part of Pro Marketing's collateral.

We find this argument unpersuasive. Priva's alleged failure to defend against Cyber's claim *could* be evidence that Priva did not consider the TRSS technology to be part of Pro Marketing's collateral, but this failure could also indicate simply that Priva breached Article 7 or that Pro Marketing agreed to waive Article 7's requirements. *See, e.g.*, *De Freitas v. Holley*, 93 A.D.2d 852, 853 (N.Y. 1983) ("It is well established that a party for whose benefit a provision is inserted in a contract may waive that provision and accept performance of the contract as is . . . ."). At most, then, Priva's alleged failure is vague and equivocal evidence that cannot overcome the above-described plain meaning of the contractual language. *See, e.g.*, *Little v. Kin*, 664 N.W.2d 749, 750 (Mich. 2003) ("Where the language of a legal instrument is plain and unambiguous, it is to be enforced as written and no further inquiry is permitted."); *Brad H. v. City of New York*, 951 N.E.2d 743, 746 (N.Y. 2011) ("A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties . . . .").

## 2. *Priva lacked the authority to grant Cyber superior rights in the TRSS technology*

Cyber's claim to the TRSS technology is also subject to a second flaw: Priva did not have the unfettered authority to grant the rights that it purported to grant in the License Agreement. As noted above, the Security Agreement limits Priva's right to dispose of assets pledged to Pro Marketing. It specifically states that Priva cannot transfer "any Collateral, any interest therein or any Proceeds thereof, nor waive or release any right with respect thereto, without the prior written consent of [Pro Marketing.]" And, as noted above, the definition of "Collateral" includes "Copyright Licenses." These licenses are defined as

> all agreements providing for the granting of any right in or to any Copyright (whether [Priva] is licensee or licensor thereunder) and the granting of any right in any derivative work based upon any Copyright, together with . . . any other rights or privileges to use or practice any Copyright or arising under, or corresponding or relating to, any of the foregoing.

Next, Article 5.2 of the License Agreement purports to grant Cyber "all right, title and interest in and to any and all updates, modifications or improvements to the Licensed Technology . . . whether or not . . . registrable under copyright or similar statutes." This provision plainly attempts to assign both Priva's rights "in or to [a] Copyright" and Priva's rights "corresponding or relating to" a copyright. Article 5.2 of the License Agreement therefore constitutes a "Copyright License" under the terms of Pro Marketing's Security Agreement, so the grant of rights defined in Article 5.2 was and is part of Pro Marketing's collateral.

This means that Priva did not have the unfettered authority to dispose of that collateral; instead, any waiver, release, or transfer of the collateral required "the prior written consent of [Pro Marketing.]" Nothing in the record indicates that Pro Marketing provided such consent before Priva executed the License Agreement and, in fact, Pro Marketing objected to the incorporation of the License Agreement as part of Priva's Reorganization Plan. Priva therefore lacked the

authority to grant to Cyber the unconditional rights that it purported to grant. Article 5.2 was a Copyright License, the Copyright License was part of Pro Marketing's collateral, and Priva needed Pro Marketing's written approval before Priva could dispose of that collateral. Priva did not have that approval, so its attempt to unconditionally dispose of the collateral by assigning it to Cyber was ineffective.

This interpretation is also consistent with the language in the Security Agreement that defines Pro Marketing's "Collateral" to include all of Priva's personal property "whether now owned or *hereafter arising or acquired*, . . . or in which [Priva] now has or at *any time in the future* may acquire any right, title, or interest." The parties plainly intended to grant Pro Marketing a security interest that would extend to property—such as the TRSS technology—that was not in existence at the time the Security Agreement was signed. Moreover, the parties specifically protected Pro Marketing's right to such after-acquired property by forbidding Priva from selling or transferring such property without Pro Marketing's prior written consent.

An interpretation of the Security Agreement that would allow Priva to evade Pro Marketing's security interest by disposing of the TRSS technology in the absence of such consent would consequently contravene the intent of the parties. Hence, the Security Agreement should not be read to allow such an interpretation. *See, e.g.*, *Frye v. Brown*, 189 A.D.2d 1031, 1033 (N.Y. App. Div. 1993) ("Undoubtedly, the ultimate goal in contract interpretation is realization and effectuation of the parties['] intent . . . ."). The Security Agreement must instead be read to protect Pro Marketing's interest in the TRSS technology.

**D.    The district court did not abuse its discretion or commit an error of law by refusing to consider evidence of Pro Marketing's allegedly unclean hands**

We next turn to Cyber's "unclean hands" argument. The doctrine of unclean hands is an equitable concept that allows a court to deny injunctive or declaratory relief when "the party

applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir. 1995) (quotation marks omitted). Cyber maintains that the district court abused its discretion and/or committed an error of law by imposing a requirement that the conduct at issue have a "material bearing" on the culpable party's claim for relief.

The unclean-hands argument in this case rests on the events that led to Priva's termination of its License Agreement with Cyber. As alleged in Cyber's amended complaint, Pro Marketing sued Priva's president—William Sibert—in Georgia state court in January 2012. That suit sought up to $2.6 million in damages on the ground that Sibert had fraudulently induced Pro Marketing to extend financing to Priva.

In January 2013, Sibert and Pro Marketing reached a settlement in which Pro Marketing agreed to dismiss the state-court lawsuit against Sibert. Cyber alleges that this settlement resulted from improper pressure by Pro Marketing. It maintains that Pro Marketing planned to foreclose on its security interest in the SKSIC technology, but was concerned that the License Agreement would impair the value of the SKSIC technology because the Agreement purported to grant Cyber an exclusive license to that technology. Pro Marketing thus allegedly had a motive to have the License Agreement terminated.

According to Cyber, Pro Marketing found the means to do so by leveraging its state-court action against Sibert. Pro Marketing allegedly promised to dismiss the lawsuit against Sibert provided that Sibert—as president of Priva—caused Priva to terminate its License Agreement with Cyber. Sibert purportedly accepted this agreement and caused Priva's board of directors to

terminate the License Agreement, all without disclosing that Sibert stood to personally benefit from that termination.

Based on these events, Cyber asserted a claim against Pro Marketing for intentional interference with contractual relations. In addition, Cyber claimed that these events supported the application of the unclean-hands doctrine to Pro Marketing's claim to the TRSS technology. The district court rejected this latter argument on the ground that the two claims were independent. Pro Marketing's alleged role in the termination of the License Agreement, according to the court, had no "material bearing" on Pro Marketing's *separate* claim for ownership of the TRSS technology, making an application of the unclean-hands doctrine unwarranted. Cyber now challenges that ruling on the ground that the district court adopted an erroneously narrow conception of the unclean-hands doctrine.

As noted above, the doctrine of unclean hands precludes declaratory relief when the party seeking relief is "guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue." *Performance Unlimited*, 52 F.3d at 1383. This doctrine, however, does not grant courts free-floating authority to deny declaratory relief in all cases in which a party has engaged in misconduct. Instead, the doctrine "requires that the alleged misconduct on the part of the plaintiff *relate directly to the transaction about which the plaintiff has made a complaint*." *Id.* (emphasis added). A court should therefore apply the doctrine "only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." *Id.* (citation and internal quotation marks omitted).

Michigan caselaw applies the doctrine in a similar fashion. "The misconduct which will move a court of equity to deny relief must bear a *more or less direct relation* to the transaction concerning which [a] complaint is made." *McFerren v. B & B Inv. Grp.*, 655 N.W.2d 779, 784

(Mich. Ct. App. 2002) (emphasis added) (quoting *McKeighan v. Citizens Commercial & Savings Bank of Flint*, 5 N.W.2d 524, 527 (Mich. 1942)). "Relief is not denied merely because of the general morals, character or conduct of the party seeking relief." *Id.*

Applying these principles to the present case, the district court did not abuse its discretion in deciding not to apply the doctrine of unclean hands. Pro Marketing executed its Security Agreement in April 2009, years before Pro Marketing filed the state-court action against Sibert. Likewise, Priva entered the License Agreement and began developing the TRSS technology long before Sibert and Pro Marketing executed the allegedly improper settlement agreement. Pro Marketing's security interest in the TRSS technology therefore arose entirely independent of its alleged misconduct in pressuring Sibert to terminate the License Agreement. That termination accordingly had no "immediate and necessary relation," *Performance Unlimited*, 52 F.3d at 1383, to Pro Marketing's claim to the TRSS technology.

Cyber nonetheless argues that, by filing a *counterclaim* for a declaratory judgment, Pro Marketing itself admitted that its claim to the TRSS technology "aro[se] out of the transaction or occurrence that [was] the subject matter of [Cyber's] claim." *See* Fed. R. Civ. P. 13(a)(1)(A) (defining compulsory counterclaims). According to Cyber, Pro Marketing's counterclaim is a tacit concession that ownership of the TRSS technology did in fact "relate directly" to the allegedly improper termination of the License Agreement.

This argument fails, however, because Cyber's amended complaint contains several causes of action. One of these is indeed its claim that termination of the License Agreement constituted interference with contractual relations. But the amended complaint also contains claims for declaratory and injunctive relief that seek to establish that Cyber is the owner of the TRSS technology. Pro Marketing's request for a declaratory judgment concerns ownership of the exact

same technology—i.e., TRSS—so Pro Marketing's claim arises out of the same transaction or occurrence giving rise to Cyber's claim to the TRSS technology. This means that Pro Marketing was indeed obligated to file a counterclaim to Cyber's claim to the TRSS technology if Pro Marketing wished to preserve its own claim of ownership. *See* Fed. R. Civ. P. 13(a)(1)(A). Pro Marketing's counterclaim was therefore not a tacit concession that the TRSS technology had any direct connection to the allegedly improper termination of the license agreement.

Cyber finally contends that the district court's interpretation of the unclean-hands doctrine was overly narrow and erroneous as a matter of law. We review such an argument de novo. *See Ne. Women's Ctr., Inc. v. McMonagle*, 868 F.2d 1342, 1354 (3d Cir. 1989) ("[T]he parameters of the unclean hands doctrine implicate a matter of law.").

The district court's opinion implicates the "parameters" of the unclean-hands doctrine insofar as the court restricted application of the doctrine to conduct that has a "material bearing" on a party's claims. This restriction, however, was not a legal error. To the contrary, the district court's requirement of a "material bearing" is consistent with this court's prior observations that the conduct must have a "direct[]" or "immediate and necessary relation" to the relevant claim. *See Performance Unlimited*, 52 F.3d at 1383. The court's formulation is also consistent with Michigan law, which requires a "more or less direct" relationship between the allegedly improper conduct and the claim at issue. *See McFerren*, 655 N.W.2d at 784; *accord, e.g.*, *Murray v. Moultrie*, No. 259410, 2006 WL 2060681, at *2 (Mich. Ct. App. July 25, 2006) (declining to apply the unclean-hands doctrine when improper conduct was "not inextricably linked" to claim at issue). The district court therefore committed no legal error on this issue.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.