[749 NYS2d 497]

Sabby H. Mionis et al., Appellants, v Bank Julius Baer & Co., Ltd., et al., Respondents.

First Department, October 29, 2002

## APPEARANCES OF COUNSEL

*William H. Pratt* of counsel (*Jennifer M.H. Selendy* and *Todd S. Schulman* on the brief; *Kirkland & Ellis*, attorneys), for appellants.

*Adam S. Hakki* of counsel (*Danforth Newcomb* on the brief; *Shearman & Sterling*, attorneys), for Bank Julius Baer & Co., Ltd. and another, respondents.

*Jonathan Polkes* of counsel (*Isaac Greaney* on the brief; *Cadwalader Wickersham & Taft*, attorneys), for Peter Embiricos and another, respondents.

## OPINION OF THE COURT

SULLIVAN, J.

In this action to recover damages for libel, tortious interference with contract and prospective business relations and intentional infliction of emotional distress arising out of the publication of an allegedly defamatory letter sent by defendants to the Greek Ministry falsely accusing plaintiffs and certain of their customers of being "Greek money-launderers," plaintiffs appeal from the grant of defendants' motion to stay the action and compel mediation and, if necessary, arbitration. Although effectively exonerated by the Greek authorities of any wrongdoing, plaintiffs claim to have been substantially and permanently harmed by the defamation.

Since this appeal turns on a determination of who is bound by the arbitration clause at issue, identification of the parties and an understanding of their relationship is crucial. In August 1997, plaintiff Sabby H. Mionis, a Greek citizen, left his position as an account executive at the investment firm of Donaldson, Lufkin & Jenrette Securities to establish his own investment management business, T.C. Advisors, Ltd., now known as Capital Management Advisors, Ltd. (CMA), a Bahamian corporation and a plaintiff herein. Mionis intended to set up various open-ended mutual funds to provide diversified long-term investment growth with low volatility for his clients, many of whom were Greeks, and to provide investment advice to the funds for a fee based on the size and underlying performance of the funds. Defendant Bank Julius Baer & Co., Ltd. (Bank JB) is a Swiss bank with numerous branches, including one in New York. Defendant Julius Baer Trust Company (Cayman) Ltd. (JB Cayman) is an affiliate that provides services for Bank JB clients. The various Julius Baer (JB) entities are all subsidiaries of a holding company.

In April 1998, Mionis orally agreed with Bank JB to engage various Julius Baer entities for their "Private Label Fund" services. Although these entities offer investment funds of their own, the Private Label Fund services allow Julius Baer to generate revenues by providing third-party investment managers, like T.C. Advisors, with many of the administrative and "back office" services associated with the management of investment funds. This service permits an independent investment advisor, such as T.C. Advisors, to advise and manage a pooled fund of investors' assets in custodial accounts maintained at Bank JB. The absence of written agreements between Mionis, T.C. Advisors and the various Julius Baer entities as to the provision of Private Label Fund services is standard in the industry.

Pursuant to this arrangement, Bank JB established two open-ended mutual funds domiciled in the Cayman Islands, T.C. Investments Ltd. and T.C. Multi-Hedge Ltd., wholly independent limited liability companies organized under the laws of the Cayman Islands, and opened custodial bank accounts for the two funds. JB Cayman served as the administrator, transfer agent and registrar. Directorate, Inc., a fund management company incorporated in the British Virgin Islands and wholly owned by Julius Baer Bank & Trust Co., which, in turn, is a wholly owned subsidiary of Julius Baer Holding Ltd. under the direction of Mionis and T.C. Advisors, managed the funds. Mionis and T.C. Advisors were appointed the investment advisor to the funds and authorized to invest the funds' assets in accordance with the guidelines established for each of the funds in the respective offering memoranda. In investing on behalf of the funds, Mionis would place written orders with Peter Embiricos or Theodore Goneos at Bank JB in New York. The latter was the account supervisor for the fund and reported to Embiricos, who had solicited Mionis's business and oversaw the handling of the account. Neither Embiricos nor Goneos was employed by Bank JB at the time this action was commenced.

Early in the parties' relationship tensions arose between Mionis and Bank JB New York, which preferred to provide its own investment advisory services and secure for itself the investment advisory fees being paid by the funds to Mionis and T.C. Advisors. Indeed, Bank JB New York proposed that Mionis and T.C. Advisors concentrate their efforts in acting solely as marketing agent in attracting new investors in exchange for a commission from Bank JB. Mionis rejected these overtures and, in or about May 2000, after a series of incidents that

caused Mionis to question the quality of service being provided to the funds by the Julius Baer entities, advised Embiricos and Goneos that, effective July 31, 2000, the funds would no longer require the services of Bank JB New York, JB Cayman and Directorate, Inc.

After the termination of the funds' relationship with the Julius Baer entities, officers of the Greek Economic Crime Prosecution Corps conducted a search of Mionis's office and confiscated his business records and computer files. During the investigation, Mionis, a Jew, alleges that he was repeatedly confronted with anti-Semitic comments by the authorities, who focused their investigation on several of his more prominent Jewish clients as supposed "money launderers." Ultimately, the authorities were unable to find any evidence of money laundering by Mionis or any of his clients and the investigation was closed with the levying of a small fine for "so-called bookkeeping irregularities." According to Mionis, the adverse publicity caused him to lose clients, including Greece's largest insurance company.

Subsequently, Mionis obtained from the Greek government a copy of the letter that triggered the investigation. Written on a Julius Baer letterhead and bearing the name, although not the signature, of Charles Farrington of JB Cayman, the August 5, 2000 letter stated: "Please find attached a list of Greek money-launderers (tax evasion). All of them have an account with TC Investment in the Cayman Islands." The letter further recited that the accounts were managed by Mionis, who "could give you more details about attached list." Attached to the letter was a partial printout of one of the funds' shareholder lists, which included six Greek individual investors, three of whom are alleged to be prominent Jews. The remaining shareholders, three major international corporations, two of which are prestigious Swiss banks and the third a subsidiary of the largest Swiss bank, are alleged to be Julius Baer's largest Swiss competitors.

Plaintiffs further allege that the letter's money-laundering allegation was malicious since JB Cayman was empowered under Cayman Islands law to require investors to verify both their identity and the source of the monies used to purchase shares in the funds. At no time did the administrator, JB Cayman, or the director, Directorate, Inc., seek to verify either the identity of the investors or the source of the funds invested. As noted, the two funds opened custodial accounts with Bank JB. The agreements entered into at that time between Bank JB

and the two funds, known as a "Management Authorization for Third Parties" (authorization agreement), designated T.C. Advisors as the funds' "agent and attorney-in-fact (the 'Attorney')," thus enabling it to manage the funds' assets in the accounts. The authorization agreement (1) required Bank JB to permit T.C. Advisors to direct activity in the accounts; (2) made the acts of T.C. Advisors binding on the funds; and (3) held Bank JB harmless for such acts. The agreement specifically defined the scope of T.C. Advisors' authority as "Attorney" for the funds.

The authorization agreement contained an arbitration clause for the resolution of disputes relating to the funds' banking relationship with Bank JB providing as follows:

> "If any dispute, controversy or claim arises out of or relates to any business relationship between you [the Fund] and the Bank, including but not limited to any dispute, controversy or claim with regard to this Authorization, the breach thereof or any account or transaction you have with the Bank, and if said dispute, controversy or claim cannot be settled through direct discussions, the parties agree first to endeavor to settle the dispute, controversy or claim in an amicable manner by mediation, before resorting to arbitration as detailed in the Acknowledgements and Agreements-Mediation Arbitration Form given to and signed by you [the Fund]. The Attorney hereby expressly agrees to settle by mediation and Arbitration any controversy between or among Attorney, Attorney's Client, and/or the Bank subject to the rules of the American Arbitration Association."

The agreement was signed by Peter Goulden as director of Directorate, Inc. and by Mionis as attorney-in-fact. A separate form entitled "Acknowledgements and Agreements Mediation Arbitration" sets forth, essentially, the same clause.

This action was commenced in September 2001. In November, defendants moved to stay the action and compel mediation and, if necessary, arbitration. The IAS court granted the motion, finding that T.C. Advisors entered into a broad and unambiguous agreement to mediate and, if necessary, to arbitrate "any controversy," which, in the absence of limiting language, not present here, would include the instant dispute. The court, citing *PromoFone, Inc. v PCC Mgt.* (224 AD2d 259), and the fact that the complaint treats Mionis and T.C. Advi-

sors as a single entity, held that Mionis, even though not a signatory to the authorization agreement in his individual capacity, was similarly bound by the arbitration clause because "the issues in the overall dispute are inextricably interwoven." The same reasoning, the court held, applied to defendants JB Cayman, Embiricos and Goneos, who, although not parties to the authorization agreement, engaged in substantially the same wrongful conduct as Bank JB. We reverse.

It is a fundamental principle of New York law that in the absence of an agreement to do so, parties cannot be forced to arbitrate. (*Matter of Waldron [Goddess]*, 61 NY2d 181, 183; *Schubtex, Inc. v Allen Snyder, Inc.*, 49 NY2d 1, 6; *Matter of Marlene Indus. Corp. [Carnac Textiles]*, 45 NY2d 327, 333.) An agreement to arbitrate requires a clear and unequivocal manifestation of an intention to arbitrate because it involves the "surrender [of] the right to resort to the courts." (*Matter of Waldron, supra* at 183.) In construing the arbitration clause, the IAS court held that the "plain language" of the authorization agreement "makes clear" that T.C. Advisors entered into a broad agreement to mediate and, if necessary, to arbitrate "any controversy between itself, the Fund and/or Bank JB." In so concluding, the court violated a fundamental principle of contract interpretation by failing to give effect to a defined term in the authorization agreement and ignored settled principles of agency law.

Courts are obliged to interpret a contract so as to give meaning to all of its terms. (*Corhill Corp. v S.D. Plants, Inc.*, 9 NY2d 595, 599; *Trump-Equitable Fifth Ave. Co. v H.R.H. Constr. Corp.*, 106 AD2d 242, 244, *affd* 66 NY2d 779.) The reason is clear. Since a contract is a voluntary undertaking, it should be interpreted to give effect to the parties' reasonable expectations. (*See Sutton v East Riv. Sav. Bank*, 55 NY2d 550, 555.)

Contrary to the IAS court's holding, limiting language does appear in the arbitration clause, which, significantly, nowhere refers to T.C. Advisors. Rather, it refers to "Attorney," "Attorney's Client" and the "Bank." "Attorney" is not a mere "synonym" for T.C. Advisors, as defendants argue, but, instead, is identified in the authorization agreement as T.C. Advisors in its capacity as "agent and attorney-in-fact" for the funds with respect to their accounts at Bank JB. The court completely ignored this distinction, substituting T.C. Advisors, individually, for "Attorney" in its quotation of the arbitration provision's relevant clause, stating, "[T.C. Advisors] hereby expressly agrees to settle by mediation and Arbitration any controversy

* * *," when, in fact, the clause reads, "The Attorney hereby expressly agrees * * *." That the parties chose to define "Attorney" and to use that term, rather than T.C. Advisors, in the arbitration clause, is a clear manifestation of an intent to bind T.C. Advisors only in its representative capacity as the agent of the funds. Any other reading would impermissibly disregard the clear and unequivocal meaning given to the term by the parties.

Under a well-settled principle of agency law, an agent who signs a contract on behalf of a known principal cannot be held to have made a commitment in his or her individual capacity. (*Shoenthal v Bernstein*, 276 App Div 200, 205.) This principle has been consistently applied in the context of arbitration. (*See e.g. Matter of Metamorphosis Constr. Corp. v Glekel*, 247 AD2d 231; *Matter of Kummerfeld [Sakai]*, 186 AD2d 90, *lv dismissed in part and denied in part* 82 NY2d 682; *Johnston v Silverman*, 167 AD2d 284; *Matter of Jevremov [Crisci]*, 129 AD2d 174.) Here, the authorization agreement was executed on behalf of T.C. Advisors as an agent of the funds with respect to the custodial accounts. T.C. Advisors' agreement to arbitrate was limited to its capacity as agent of the funds, not in its general corporate capacity. As in the cases cited, T.C. Advisors cannot be bound to arbitrate claims, such as those at issue here, brought in its individual capacity for harm it suffered in that capacity.

The IAS court further found, incorrectly, that the authorization agreement requires arbitration of "any controversy" between T.C. Advisors and Bank JB. The arbitration clause provides for the arbitration of "any controversy between or among Attorney, Attorney's Client, and/or the Bank." Given the agreement's definition of "Attorney", i.e., T.C. Advisors in its capacity as a limited agent of the funds with respect to the custodial accounts maintained at Bank JB, the only controversies that might arise "between or among Attorney, Attorney's Client, and/or the Bank" are those relating to the terms of the authorization agreement, the funds' general relationship with the Bank, or T.C. Advisors' management of the funds' custodial accounts at the Bank. None of T.C. Advisors' claims against Bank JB—defamation and tortious interference with contract and prospective business relations—arise out of the banking relationship between the funds and Bank JB. Nor do its claims arise out of its role as agent of the funds with authority to direct the activity in the bank accounts.

Moreover, since T.C. Advisors' agency as "Attorney" for the funds terminated in July 2000 when the funds closed their ac-

counts at Bank JB, this controversy, which arose in November 2000, does not fall within the scope of the arbitration clause. This is not to say, of course, that a contract's arbitration clause cannot survive termination of the contract. The irrefutable facts are that, here, the events giving rise to the claims asserted in the complaint all took place after the termination of the authorization agreement and, furthermore, that these claims are unrelated to the scope of T.C. Advisors' role as "Attorney," as defined by the agreement. A party who agrees to arbitration in its capacity as an agent can neither bring a claim nor have a claim brought against it under the arbitration provision if the claim is not related to the scope of the agency. (*See Hirschfeld Prods. v Mirvish*, 88 NY2d 1054.) Here, the claims are clearly outside the scope of T.C. Advisors' agency.

Finally, in holding that four nonsignatories to the authorization agreement—Mionis, JB Cayman, Embiricos and Goneos—could be compelled to arbitrate, the IAS court relied upon *PromoFone, Inc. v PCC Mgt.* (224 AD2d 259, 260, *supra*) for the proposition that where nonarbitrable and arbitrable claims are "inextricably interwoven," a court may compel arbitration of the nonarbitrable as well as the arbitrable claims. The "inextricably interwoven" analysis of *PromoFone*, however, has been explicitly considered and rejected by the Court of Appeals in *TNS Holdings v MKI Sec. Corp.* (92 NY2d 335, 340), which held that "interrelatedness, standing alone, is not enough to subject a nonsignatory to arbitration." Thus, the IAS court erred in its reliance on *PromoFone* as a basis for compelling the four nonsignatories to arbitrate the claims at issue herein.

Moreover, even if *PromoFone* had not been implicitly overruled, such reliance would still have been misplaced. As already noted, the wrongful conduct alleged in the complaint had nothing to do with the relationship between T.C. Advisors' agency role as investment advisor to the funds under the authorization agreement and Bank JB's custodial duties with respect to the funds' accounts. Even if there were some relationship, it cannot be said that the allegations of wrongdoing and the obligations under the authorization agreement were so connected as to be "inextricably interwoven." (*Cf., Matter of OptiMark Tech. v International Exch. Networks*, 288 AD2d 75.)

Accordingly, the order of the Supreme Court, New York County (Richard Lowe, III, J.), entered February 25, 2002, granting defendants' motion to stay the action and compel mediation, and, if necessary, arbitration, should be reversed, on the law, with costs and disbursements, and the motion denied.

NARDELLI, J.P., MAZZARELLI, ROSENBERGER and MARLOW, JJ., concur.

Order, Supreme Court, New York County, entered February 25, 2002, reversed, on the law, with costs and disbursements, and the motion to stay the action and compel mediation denied.