Mak Tech. Holdings Inc. v Anyvision Interactive Tech. Ltd. (2022 NY Slip Op 07507)

Mak Tech. Holdings Inc. v Anyvision Interactive Tech. Ltd.

2022 NY Slip Op 07507

Decided on December 29, 2022

Appellate Division, First Department

WEBBER, J: 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: December 29, 2022
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Sallie Manzanet-Daniels
Troy K. Webber Angela M. Mazzarelli David Friedman Martin Shulman

Index No. 656370/21 Appeal No. 16660 Case No. 2022-02600 

[*1]Mak Technology Holdings Inc., Plaintiff-Respondent,
v
Anyvision Interactive Technologies Ltd., Defendant-Appellant.

Defendant appeals from the Order of the Supreme Court, New York County (Melissa Crane, J.), entered on or about May 18, 2022, which denied defendant's motion to dismiss the first cause of action for breach of contract to the extent it seeks a $1,250,000 referral fee.

Simon Lesser PC, New York (Leonard F. Lesser and Nathaniel Levy of counsel), for appellant.
Hinckley & Heisenberg LLP, White Plains (Christoph C. Heisenberg of counsel), for respondent.

WEBBER, J: 

Plaintiff MAK Technology Holdings Inc., (MAK) alleges that defendant Anyvision Interactive Technologies Ltd. (Anyvision) breached the parties' Referral Agreement by failing to pay a fee for plaintiff's referral of an investor to defendant.
Defendant Anyvision is an Israeli company founded in 2015 that offers artificial intelligence driven facial recognition programs to businesses and governments. On July 10, 2017, Anyvision and MAK entered into a referral agreement whereby MAK would refer MGM Resorts International and its U.S.-based affiliates to Anyvision in exchange for payment based on revenues that Anyvision received through the relationship. On November 23, 2017, MAK and Anyvision entered into a similar referral agreement (the Referral Agreement) to allow MAK to refer more businesses to Anyvision in exchange for payment.
While performing services under the Referral Agreement, MAK learned that some companies to which it was introducing Anyvision were interested in investing in Anyvision. Accordingly, the parties entered into an amendment in January 2018 (the 1st Amendment) under which Anyvision would pay MAK a fee for certain approved investors which consummate (a) an equity investment in Anyvision or (b) an acquisition or merger involving all or substantially all of the assets or shares of Anyvision. Nonparty Eldridge Industries LLC (Eldridge) was one such approved investor.
On July 19, 2018, Eldridge made a $7 million investment in Anyvision. However, Anyvision delayed payment of the referral fee, claiming that MAK's fees were too high.
The parties thereupon restructured MAK's fees through an amendment dated August 24, 2018 (the 2nd Amendment). MAK alleges that the effective date of the 2nd Amendment is August 24, 2018, and that Anyvision again granted MAK compensation based on Eldridge making an additional investment during the term, with MAK's compensation to be calculated based on the cash "paid or payable to the Company from such Investment transaction," with no temporal limitation on the "tail" provision for future investments.
On September 3, 2020, Anyvision announced that it had raised $43 million in capital from investors, which included Eldridge. Approximately three weeks later, on or about September 22, 2020, Anyvision's then CEO told MAK that Anyvision expected to pay MAK upon Eldridge's exercising its rights granted through Eldridge's investment, which was expected to occur during the first quarter of 2021.
On July 7, 2021, Anyvision announced that it [*2]had secured an additional $235 million in funding, with Eldridge and its affiliates investing $25 million (the Eldridge Pro Rata Participation). MAK alleges that the $25 million investment constituted sums "paid or payable to the Company" from Eldridge's September 3, 2020 investment, and was the result of the rights granted to Eldridge attendant to that investment.
The complaint alleges two causes of action, both for breach of contract. The first cause of action alleges that Anyvision breached the 2nd Amendment by failing to pay (a) a fee of $150,000 for the Second Eldridge Investment and (b) a fee of $1,250,000 for the Eldridge Pro Rata Participation. The second cause of action alleges that Anyvision failed to disclose agreements with approved customers. Referral Agreement
The first sentence of the Referral Agreement states: "This Referral Agreement ('Agreement') is made and entered into as of this 23rd day of November, 2017 (the 'Effective Date') by and between [Anyvision] . . . and [MAK]." Under Paragraph 8.1, the Referral Agreement was to last for three years, it being understood that a "Qualified Transaction" could extend the term beyond the three years:
"8.1 Term. This Agreement shall commence on the Effective Date and shall remain in force for a period of three (3) years unless earlier terminated in accordance with Sections 8.2. ('Term'). The Term may be extended by the written agreement of both parties. It is understood that the term of a Qualified Transaction may extend beyond the three year term of this Agreement and in such event the provisions of this Agreement including, but not limited to, the payment of Consideration shall survive the termination of this Agreement and remain in full force and effect as if this Agreement were not terminated, in [sic] pursuant with Section 8.2 below."
"Qualified Transaction" is defined in Section 1.2 to mean certain commercial transactions, and MAK would be entitled to fees from a Qualified Transaction with approved customers for a period of four years, i.e., three years from the first anniversary of the customer approval. Under Section 1.3, MAK's fee would be calculated on net revenues from a Qualified Transaction for the next six years. The agreement provided, "For clarity, the time periods referenced in this Section 1.3 may be extended upon both Parties [sic] mutual written consent."
The Referral Agreement could not be changed "except in writing signed by both parties hereto." The 2nd Amendment
The 2nd Amendment, executed August 24, 2018, states, in relevant part:
"1. Reference is hereby made to that certain Referral Agreement by and among Anyvision Interactive Technologies Ltd. and MAK dated November 23, 2017 (the 'Agreement') as amended on January 28, 2018 (the '1st Amendment'). Unless otherwise defined, capitalized terms used herein shall have the meaning ascribed to them under the Agreement.
2. Each of the undersigned hereby agrees that the with affect as of the date hereof [sic[*3]] and notwithstanding anything to the contrary in the Agreement, the Agreement shall be amended as follows. . .
. . . . c. In the event the Company and an Approved Investor or [Eldridge] consummates any of the following transactions during the Term: (a) an (additional) equity investment in the Company . . . then Referrer shall be entitled to consideration in an amount equal to five percent (5%) of the actual net amounts of cash and or any securities paid or payable to the Company from such Investment transaction. . . .
6. Except as specifically provided above, the Agreement as amended hereby, shall remain unchanged as originally constituted."
Anyvision filed a pre-answer motion to dismiss, redacted in the public record, pursuant to CPLR 3211(a)(1) and (a)(7), seeking dismissal of MAK's "primary claim for a $1,250,000 referral fee" contained within its first cause of action, and a stay of discovery pending determination of its motion pursuant to Commercial Division Rule 11(d).
Anyvision argued that the $1.25 million referral fee was premised on the Eldridge Pro Rata Participation made July 7, 2021, which was outside the term of the Referral Agreement that expired on November 23, 2020. It contended that the 2nd Amendment omitted language that would have extended the Referral Agreement's three-year Term to August 2021.
In opposition, MAK argued that Section 8.1 of the Referral Agreement stated only that the three-year term would commence on the effective date and that, because the 2nd Amendment adopted a new effective date of August 24, 2018, the amended Referral Agreement had a new three-year term ending August 24, 2021 — after the Eldridge Pro Rata Participation.
The core of the parties' dispute over the expiration date of the 2nd Amendment focuses on whether the 2nd Amendment modified the Referral Agreement's effective date, thus changing its end date and bringing the Eldridge Pro Rata Participation within the Agreement's three-year term.
The Referral Agreement dated November 23, 2017, defined November 23, 2017 as the "Effective Date." Section 8.1 defines the word Term as follows:
"This agreement shall commence on the Effective Date and shall remain in force for a period of three (3) years" . . .
The 2nd Amendment states that "[e]xcept as specifically provided above, the Agreement as amended hereby, shall remain unchanged as originally constituted." It also states: "Each of the undersigned hereby agrees that the with affect as of the date hereof and notwithstanding anything to the contrary in the Agreement."
We agree with Supreme Court that the clause "the with affect as of the date hereof" contained in Paragraph 2 of the 2nd Amendment renders the agreement ambiguous as to whether it did or did not create a new effective date for the modified Referral Agreement.
We are in full agreement with the dissent that "a written agreement that is clear, complete and subject to only one reasonable interpretation must be [*4]enforced according to the plain meaning of the language chosen by the contracting parties. To determine whether a writing is unambiguous, language should not be read in isolation because the contract must be considered as a whole" (Brad H. v City of New York, 17 NY3d 180, 185 [2011] [citations and internal quotation marks omitted]). We also agree that "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing" (Vermont Teddy Bear Co. v 538 Madison Realty Co., 1 NY3d 470, 475 [2004] [internal quotation marks omitted]).[FN1]
We disagree that the clause, on its face, is reasonably susceptible of only one reasonable interpretation. The fact that the clause is clearly susceptible of multiple reasonable interpretations renders it ambiguous (see Schulte Roth & Zabel LLP v Metropolitan 919 3rd Ave. LLC, 202 AD3d 641, 641-642 [1st Dept 2022]; Liberty Sq. Realty Corp. v Doe Fund, Inc., 202 AD3d 55, 67 [1st Dept 2021], lv dismissed 38 NY3d 1124 [2022]).
The dissent's attempt at definitional gymnastics does not resolve the ambiguity. Nor, does its argument that "[t]he word 'the' before 'with' is plainly extraneous and can only be a typographical error, and the word 'affect' (a verb) is apparently a misspelling of the related word 'effect' (the noun form of the same word)."
The phrase "the with affect" evidences a clear error, as "the" requires a noun following it, and neither "with" nor "with affect" is a noun. While the dissent argues that the language "the with affect as of the date hereof," should obviously be corrected to state "with effect as of the date hereof," it could also be corrected to state "with the Effective Date as the date hereof."
Unlike the dissent, we are not ascribing one interpretation over the other. Rather, we are pointing out the multiple reasonable interpretations and concluding that additional information is necessary to ascertain the proper interpretation (see Castellano v State of New York, 43 NY2d 909 [1978]). In Castellano, when faced with a word in a lease clause that was grammatically inconsistent with the rest of the lease, the Court considered the different ways the parties proposed to change the clause to render it grammatically correct, both of which were reasonable. Each required altering a word in the lease. Rather than choosing one alteration over another, the Court found that there should be an exploration to ascertain the proper interpretation. Castellano makes clear that, in the face of a grammatically incorrect or inconsistent clause, the court may re-read the clause so as to render it sensible, provided that the re-reading is reasonable in light of the remainder of the agreement. Further, as long as the court cannot affirmatively decide in favor of dismissal, the matter should be explored to ascertain the proper interpretation (see Castellano 43 NY2d at 912; see also LDIR, LLC v DB Structured [*5]Prods., Inc., 172 AD3d 1, 5 [1st Dept 2019]).
Contrary to the arguments espoused by the dissent, these are not "inadvertent errors," or a "mistake" that can be corrected without altering the intent of the parties (see Duane Reade, Inc. v Cardtronics, LP, 54 AD3d 137 [1st Dept 2008]). While "mistakes in grammar, spelling or punctuation should not be permitted to alter, contravene or vitiate manifest intention of the parties as gathered from the language employed" (Banco EspÍrito Santo, S.A. v ConcessionÁria Do Rodoanel Oeste S.A., 100 AD3d 100, 109 [1st Dept 2012]), the 2nd Amendment cannot be rendered grammatically correct without possibly altering the parties' intent. "[T]he question of whether an ambiguity exists must be ascertained from the face of an agreement without regard to extrinsic evidence"(Reiss v Financial Performance Corp., 97 NY2d 195, 199 [2001] [internal quotation marks omitted]). Here, the 2nd Amendment's language is literally unclear and ambiguous and must be interpreted in light of extrinsic evidence (see LDIR, 172 AD3d at 4-6).
Accordingly, the order of the Supreme Court, New York County (Melissa Crane, J.), entered on or about May 18, 2022, which denied defendant's motion to dismiss the first cause of action for breach of contract to the extent it seeks a $1,250,000 referral fee, should be affirmed, with costs.
All concur except Friedman, J., and Shulman, J.,
who dissent in an Opinion by Friedman, J.

FRIEDMAN, J. (dissenting)
 

"[A] court violate[s] a fundamental principle of contract interpretation by failing to give effect to a defined term in the [parties'] agreement" (Mionis v Bank Julius Baer & Co, 301 AD2d 104, 109 [1st Dept 2002]). The order under review is based upon precisely such an error. Specifically, the claim at issue is based upon a written amendment of the parties' original written agreement expressly providing (1) that capitalized terms used in the amendment "shall have the same meaning ascribed to them" in the original agreement, and (2) that the original agreement "shall remain unchanged as originally constituted," except as expressly modified by the amendment. Nonetheless, Supreme Court deemed the amendment's use of the capitalized word "Term" to be ambiguous, even though nothing in the amendment changes the original agreement's definition of "Term" to mean a period of three years from the "Effective Date" of the inception of the original agreement — "Effective Date" also being a capitalized term defined in the original agreement, and one that does not even appear in the amendment (and, perforce, is not redefined therein). Because, as more fully explained below, the unchanged definition of the capitalized word "Term" is, as a matter of law, dispositive of the claim at issue, I believe that we should reverse and grant defendant's motion to dismiss that claim. Accordingly, I respectfully dissent.
Defendant Anyvision Interactive Technologies Ltd. (Anyvision) and plaintiff MAK Technology Holdings, [*6]Inc. (MAK) entered into a Referral Agreement, dated November 23, 2017 (the Referral Agreement). Under the Referral Agreement, MAK would become entitled to receive a referral fee from Anyvision if an "Approved Customer" entered into a "Qualified Transaction" with Anyvision for the purchase of a license to use the latter's facial recognition products within a given time frame. The preamble of the Referral Agreement defines the capitalized term "Effective Date" (bolding in original) as November 23, 2017. Section 8.1 of the Referral Agreement, entitled "Term," provides in pertinent part:
"This Agreement shall commence on the Effective Date and shall remain in force for a period of three (3) years unless earlier terminated in accordance with Section 8.2 ("Term"). The Term may be extended by the written agreement of both parties."
As relevant to this appeal, Section 11 of the Referral Agreement, which contains a standard integration clause, provides that "[n]o changes shall be made to this Agreement except in writing signed by both parties hereto."
The parties subsequently entered into a written Amendment of the Referral Agreement, dated January 31, 2018 (the First Amendment), under which the parties "agree[d] that the [sic] with affect [sic] as of the date hereof and notwithstanding anything to the contrary in the [Referral] Agreement, the Agreement shall be amended as follows." The First Amendment, which provided that it would be added as "Exhibit B" to the Referral Agreement, then granted MAK the right to introduce to Anyvision a specified "Approved Investor" (Eldridge Industries, LLC [Eldridge]) and to earn a specified fee "[i]n the event [Anyvision] and an Approved Investor [i.e., Eldridge] consummates [sic]" an investment transaction meeting specified criteria "during the Term" (emphasis added). Section 5 of the First Amendment provides: "Except as specifically provided above, the [Referral] Agreement as amended hereby, shall remain unchanged as originally constituted."
MAK's complaint alleges that, after Eldridge made a $7 million investment in Anyvision in July 2018, the parties agreed to a further amendment of the Referral Agreement to "restructure[]" MAK's compensation for this investment as a mix of cash and stock options, and to specify the terms of MAK's compensation for any future investments in Anyvision by Eldridge or other Approved Investors. The relevant terms of the parties' second amendment of the Referral Agreement, dated August 24, 2018 (the Second Amendment), are as follows:
"Re: 2nd Amendment of the Referral Agreement
"1. Reference is hereby made to that certain Referral Agreement by and among Anyvision . . . and MAK dated November 23, 2017 (the "Agreement") as amended on January 28, 2018 (the "1st Amendment"). Unless otherwise defined, capitalized terms used herein shall have the meaning ascribed to them under the Agreement.
"2. Each of the undersigned hereby agrees that the [sic] with affect [sic] as of the date hereof and [*7]notwithstanding anything to the contrary in the Agreement, the Agreement shall be amended as follows [emphasis added]:
"The following Exhibit shall replace the previous Exhibit B (as agreed in the 1st Amendment) and this should be added to the Agreement as Exhibit B instead. The parties agree that the Agreement and this Exhibit hereto constitute the full and entire understanding and agreement between the Parties with regard to the subject matters hereof and thereof and any other written or oral agreement relating to the subject matter hereof existing between the parties is expressly canceled, including without limitation the 1st Amendment:
Exhibit B
"3. [Anyvision] has agreed to grant [MAK] the right to introduce certain individuals and entities that would be interested in investing in [Anyvision] ("Potential Investors"). . . .
"c. In the event [Anyvision] and an Approved Investor or the Previously Approved Investor consummates [sic] any of the following transactions during the Term [emphasis added]: (a) an (additional) equity investment in [Anyvision] (for the avoidance of doubt, not including the Eldridge Investment) ; or (b) an acquisition or merger involving all or substantially all of the assets or shares of [Anyvision] (each an "Investment"), then [MAK] shall be entitled to consideration in an amount equal to [a specified formula] per each of such Approved Investor and Previously Approved Investor Investments. . . ."
Finally, the last section (section 6) of the Second Amendment provides: "Except as specifically provided above, the Agreement as amended hereby, shall remain unchanged as originally constituted" (emphasis added).
The basis of the claim at issue on this appeal is a July 2021 transaction, in which Eldridge allegedly invested $25 million in Anyvision. MAK contends that, under the Referral Agreement, as modified by the Second Amendment, the July 2021 transaction entitles it to a five percent referral fee in the amount of $1.25 million.[FN2] Although the July 2021 transaction took place more than three years after the inception of the Referral Agreement in November 2017 — and thus after the Referral Agreement had expired by its original terms — MAK argues that the Second Amendment reset the "Effective Date" of the Referral Agreement to August 24, 2018, and, therefore, the July 2021 transaction occurred while the Referral Agreement was still in effect. In the order from which this appeal is taken, Supreme Court denied Anyvision's motion to dismiss MAK's claim insofar as it arises from the July 2021 transaction, based on the court's view that the Second Amendment is ambiguous as to whether it reset the "Effective Date" of the Referral Agreement to August 24, 2018.[FN3] While the majority agrees with this resolution, I do not.
The Court of Appeals has expressed the "cardinal principles of contractual interpretation" (Brad H. v City of New York, 17 NY3d 180, 185 [2011]) as follows:
"A written agreement that is clear, complete and subject [*8]to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties. To determine whether a writing is unambiguous, language should not be read in isolation because the contract must be considered as a whole. Ambiguity is determined within the four corners of the document; it cannot be created by extrinsic evidence that the parties intended a meaning different than that expressed in the agreement and, therefore, extrinsic evidence may be considered only if the agreement is ambiguous. Ambiguity is present if language was written so imperfectly that it is susceptible to more than one reasonable interpretation" (id., 17 NY3d at 185-186 [citations and internal quotation marks omitted]).
Moreover, "whether or not a writing is ambiguous is a question of law to be resolved by the courts" (W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 162 [1990]; see also Matter of Banos v Rhea, 25 NY3d 266, 276 [2015] ["Whether a contract is ambiguous is a question of law, and courts may not resort to extrinsic evidence to aid in interpretation unless the document is ambiguous"], citing Consedine v Portville Cent. School Dist., 12 NY3d 286, 293 [2009]; Greenfield v Philles Records, 98 NY2d 562, 569 [2002] [same]; Matter of Wells Fargo Bank, N.A., 198 AD3d 156, 163 [1st Dept 2021], lv dismissed 38 NY3d 998 [2022] ["The court was correct not to consider extrinsic evidence" where the written agreement "unambiguously" addressed the matter in dispute]).
In addition, where an agreement was
"negotiated between sophisticated, counseled business people negotiating at arm's length . . . courts should be extremely reluctant to interpret an agreement as impliedly stating something that the parties have neglected to specifically include. Hence, courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing" (Vermont Teddy Bear Co. v 538 Madison Realty Co., 1 NY3d 470, 475 [2004] [citations and internal quotation marks omitted]).[FN4]
Finally, "clear contractual language does not become ambiguous simply because the parties to the litigation argue different interpretations" (Riverside S. Planning Corp. v CRP/Extell Riverside, L.P., 60 AD3d 61, 67 [1st Dept 2008], affd 13 NY3d 398 [2009]; see also Sasson v TLG Acquisition LLC, 127 AD3d 480, 481 [1st Dept 2015] ["(a) contract is not rendered ambiguous simply because one of the parties attaches a different, subjective meaning to one of its terms"]). In sum, in construing an unambiguous written agreement, we "concern ourselves 'with what the parties intended, but only to the extent that they evidenced what they intended by what they wrote'" (Ashwood Capital, Inc. v OTG Mgt., Inc., 99 AD3d 1, 7 [1st Dept 2012], quoting Rodolitz v Neptune Paper Prods., 22 NY2d 383, 387 [1968]).
I am unable to see the ambiguity the majority claims to detect in the Second Amendment[*9]. As detailed above, the Second Amendment expressly provides, in section 1, that, "[u]nless otherwise defined, capitalized terms used herein shall have the meaning ascribed to them under the [Referral] Agreement." Further, section 6 of the Second Amendment (the instrument's final section) provides that, "[e]xcept as specifically provided above, the [Referral] Agreement as amended hereby, shall remain unchanged as originally constituted." Since the Second Amendment is devoid of language purporting to change the definition of the term "Effective Date" in the original Referral Agreement, that definition — setting November 23, 2017, as the Effective Date — was not changed by the Second Amendment. If this were somehow not enough, the Second Amendment itself uses the capitalized word "Term" and, to reiterate, the Second Amendment expressly provides that capitalized terms it uses "shall have the same meaning ascribed to them in the [Referral] Agreement." As noted, the capitalized word "Term" is expressly defined in the Referral Agreement to mean three years from the Effective Date, namely, November 23, 2017. Thus, by using the capitalized word "Term," defined with reference to the term "Effective Date," the Second Amendment incorporates by reference the Referral Agreement's definition of the "Effective Date" as November 23, 2017 (see 87 Mezz Member LLC v German Am. Capital Corp., 162 AD3d 524, 525 [1st Dept 2018] ["Because the AIA uses the capitalized term 'Event of Default' without defining it, the meaning of the term as used in the AIA is to be found in the Loan Agreement pursuant to section 1.1 of the AIA, which provides that 'all capitalized terms used herein shall have the meanings assigned to such terms in the Loan Agreement'"] [internal brackets omitted]).
The majority reaches a different conclusion based on the opening sentence of section 2 of the Second Amendment, but that sentence cannot reasonably be construed to change the Referral Agreement's definition of "Effective Date." That sentence states only that each of the parties "agrees that the [sic] with affect [sic] as of the date hereof and notwithstanding anything to the contrary in the [Referral] Agreement, the Agreement shall be amended" in the manner set forth thereafter (emphasis added). The word "the" before "with" is plainly extraneous and can only be a typographical error, and the word "affect" is apparently a misspelling of the related word "effect" (see Merriam Webster's Collegiate Dictionary [10th ed], at 19 [defining "3affect," in pertinent part, as a transitive verb meaning "to produce an effect upon"]).[FN5] I fail to see how such obviously inadvertent errors — which also appear in the identical sentence in the First Amendment — indicate any intention to change the definition of the capitalized phrase "Effective Date."
Further, the phrase "with effect as of the date hereof" (correcting the typographical errors) plainly modifies the later phrase "the Agreement shall be amended as follows[*10]" — meaning that the first phrase sets forth only the date on which the modification represented by the Second Amendment took effect. There is nothing in this language to indicate an intention to reset the "Effective Date" of the entire Referral Agreement itself, something that these sophisticated parties could easily have done explicitly had that been their intention (see Vermont Teddy Bear, 1 NY3d at 476 ["judicial insertion of a contract term" regarding notice was not warranted where "(t)he parties could have negotiated and included an explicit notice requirement . . . (but) did not do so"]; Reiss v Financial Performance Corp., 97 NY2d 195, 199 [2001] ["this Court will not imply a term where the circumstances surrounding the formation of the contract indicate that the parties, when the contract was made, must have foreseen the contingency at issue and the agreement can be enforced according to its terms"]; Ashwood Capital, Inc. v OTG Mgt., Inc., 99 AD3d 1, 8 [1st Dept 2012] [contractual references to "Terminal 6" could not reasonably be construed to include a different terminal, since "(i)f these commercially sophisticated and counseled parties had intended their agreement to apply to any JetBlue terminal at JFK, they could easily have expressed this intent in the language of the agreement"]; Bazin v Walsam 240 Owner, LLC, 72 AD3d 190, 195 [1st Dept 2010] ["Nor is it appropriate to find implicit in the lease a provision that the parties could have included, but did not"]).
While the majority deprecates the foregoing analysis of the contractual language as an "attempt at definitional gymnastics," I am merely following established precedent directing us, in determining whether or not a written agreement contains an ambiguity, "[to] read the document as a whole to ensure that excessive emphasis is not placed upon particular words or phrases" (South Rd. Assoc., LLC v International Bus. Mach. Corp., 4 NY3d 272, 277 [2005], citing Matter of Westmoreland Coal Co. v Entech, Inc., 100 NY2d 352, 358 [2003] [finding no ambiguity when the agreement was read "as a harmonious and integrated whole"]; see also Consedine v Portville Cent. School Dist., 12 NY3d 286, 293 [2009]; Hudson-Port Ewen Assoc., L.P. v Chien Kuo, 78 NY2d 944, 945 [1991] ["Where consideration of a contract as a whole resolves the ambiguity created by one clause, there is no occasion to consider extrinsic evidence of the parties' intent"]; Riverside S. Planning Corp., 60 AD3d at 66-67).
The majority acknowledges that we "may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing" (Vermont Teddy Bear, 1 NY3d at 475 [internal quotation marks omitted]), but then proceeds to do exactly that, using the aforementioned transparent typographical errors as a warrant. The majority suggests that the typographical errors could be corrected — rather than by simply omitting the extraneous[*11]"the" and changing "affect" to "effect" — by completely rewriting "the with affect as of the date hereof" (leaving the errors uncorrected) as "with the Effective Date as the date hereof."[FN6] The failure to use the capitalized term "Effective Date" in the sentence would be particularly odd, had the parties truly intended to redefine it, given that the immediately preceding sentence plainly states — in italics, no less — that, "[u]nless otherwise defined, capitalized terms used herein shall have the meaning ascribed to them under the [Referral] Agreement." Unquestionably, if the parties had intended to redefine the term "Effective Date" in this passage, they could easily have done so, and the evident typographical errors do not remotely suggest that they had any such intention. Thus, by inserting the absent term "Effective Date," and making numerous other changes (numerous, that is, in relation to the length of the passage in question), the majority potentially has "made a new contract for the parties under the guise of interpreting the writing" (id. [internal quotation marks omitted]). Using underlining to show additions and striking out to show deletions, the majority's suggested alternative "interpretation" of the passage in question can be rendered as follows: "the with the Eaffective Date as of the date hereof."[FN7] In sum, the majority's alternative reading of the contractual language is so far-fetched that it cannot be said to constitute a "reasonable interpretation" (Brad H., 17 NY3d at 186) that could support a finding of ambiguity.
The majority's approach opens the door to the wholesale rewriting of written agreements based on nothing more than transparent minor typographical errors that cast no doubt on the parties' intent. The majority cites no precedent supporting its surprising assertion that the two small, transparent typographical errors at issue — again, merely one extraneous article ("the") and one common misspelling ("affect" in place of "effect") — cannot be corrected "without altering the intent of the parties" and, therefore, those two errors open the door to the rewriting of the contract.[FN8] Unlike the two decisions on which the majority relies in this regard (Castellano v State of New York, 43 NY2d 909, 912 [1978]; LDIR, LLC v DB Structured Prods, Inc., 172 AD3d 1, 5 [1st Dept 2019]), in this case there is only one reasonable and natural way to change the clause to eliminate the obvious minor errors. As the majority itself concedes, the general rule is that "[m]istakes in grammar, spelling or punctuation should not be permitted to alter, contravene or vitiate manifest intention of the parties as gathered from the language employed" (Banco EspÍrito Santo, S.A. v Concessionaria Do Rodoanel Oeste S.A., 100 AD3d 100, 109 [1st Dept 2012]). That general rule, which the majority flouts, plainly applies here. If it were otherwise, every typographical error in a contract would create an ambiguity. Perhaps the majority is not troubled by this [*12]prospect, but I am.
The majority's discussion of Castellano only highlights that decision's inapplicability to the issue raised on this appeal. In Castellano, a genuine grammatical inconsistency within the lease at issue was held to create an ambiguity, the resolution of which (through the admission of extrinsic evidence) the Court of Appeals held to be a matter of interpretation, not reformation (43 NY2d at 911). As the Court of Appeals later observed, the approach the Castellano court permitted — i.e., "transpos[ing], reject[ing], or suppl[ying] [words] to make [the contract's] meaning more clear" (43 NY2d at 911) — "is appropriate only in those limited instances where . . . the contract would otherwise be unenforceable either in whole or in part" (Matter of Wallace v 600 Partners Co. 86 NY2d 543, 547-548 [1995]). This condition plainly is not satisfied here, where we are dealing with nothing more than one extraneous article ("the") and a common one-letter misspelling, each of which is an obvious typographical error having no bearing on the intended meaning of the language. Nonetheless, based solely on these trivial typographical errors, the majority proposes that a factfinder be permitted to read an otherwise absent defined capitalized term from the original agreement ("Effective Date") into the sentence, so as to create a redefinition of that otherwise absent term. There is no support for this approach in Castellano or any other authority cited by the majority.
Finally, I agree with Anyvision that the investment it received in the July 2021 transaction was not "payable" pursuant to an earlier investment transaction consummated in September 2020, before the expiration of the Term of the Referral Agreement. It is undisputed that the terms of the September 2020 transaction did not obligate Eldridge to make the further investment involved in the July 2021 transaction, on which the claim at issue is based.
For the foregoing reasons, I would reverse the order under review, to the extent it is appealed from, and grant Anyvision's motion pursuant to CPLR 3211(a)(1) and (7) to dismiss MAK's first cause of action insofar as it is based on the July 2021 transaction.
Order, Supreme Court, New York County (Melissa Crane, J.), entered on or about May 18, 2022, affirmed, with costs.
Opinion by Webber, J. All concur except Friedman, J., and Shulman, J. who dissent in an Opinion by Friedman, J.
Manzanet-Daniels, J.P., Webber, Mazzarelli, Friedman, Shulman, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: December 29, 2022

Footnotes

Footnote 1: The dissent's argument that the agreement was "negotiated between sophisticated, counseled business people negotiating at arm's length" is at odds with MAK's assertion on appeal that Anyvision's counsel drafted language and presented it to an unrepresented party. Notably, this assertion was not contradicted by Anyvison in reply. 

Footnote 2: MAK's claim for a referral fee of $150,000, based on a transaction of lesser value that took place in September 2020, is not at issue on this appeal.

Footnote 3: The transcript of the oral argument of Anyvision's motion to dismiss before Supreme Court reflects that the court initially saw merit in Anyvision's position. The court pressed MAK's counsel as follows: "The documents are clear to me right now. So . . . how is [the July 2021 transaction] during the Term?"

Footnote 4: In response to my quotation of the Court of Appeals' statement in Vermont Teddy Bear discouraging the judicial rewriting of contracts "negotiated between sophisticated, counseled business people negotiating at arm's length" (id.), the majority points to the unsupported assertion in MAK's appellate brief that the contractual language in question was drafted by Anyvision's counsel and "presented to an unrepresented party." Even if MAK did not bother to consult with counsel concerning the transactions in question (the record does not address whether or not this was the case), it is difficult to conceive that a party lacking in sophistication could be in the business of making referrals for the purpose of putting together multi-million-dollar deals in the high-tech sector. Further, even if Anyvision's counsel drafted the contractual documents, that would not make the agreements contracts of adhesion, nor would it render it appropriate for us to read an otherwise absent ambiguity into those contracts.

Footnote 5: While "affect" can also be a noun, its definitions as a noun are plainly out of place in this context (see id. [definitions of "1affect" and "2affect"]).

Footnote 6: Needless to say, the majority's suggested alternative "correction" of the language in question is actually more clumsy and less natural than the language actually typed, even with the typographical errors.

Footnote 7: The majority proposes that the passage in question ("the with affect as of the date hereof") may have resulted from the following series of unintended errors in typing the language MAK would prefer ("with the Effective Date as the date hereof"): (1) the transposition of "the" and "with" at the beginning of the phrase; (2) the misspelling of "Effective" as "affect," and failing to capitalize the first letter; (3) omitting entirely the word "Date"; and (4) inserting an extraneous "of" before "the date hereof." Under this theory of what the parties intended, the person who typed the language in question made errors involving a total of 17 letters (one of which was both the wrong letter and typed in the wrong case). By contrast, considering the beginning "the" as an error and "affect" as a misspelling of "effect," the typist would have made errors involving a total of only four letters, the correction of which is shown as follows: "the with eaffect as of the date hereof." As shown by the foregoing, it is the majority, not I, that engages in "gymnastics" in an attempt to give MAK an opportunity to have a trial court rewrite the parties' agreement.

Footnote 8: Indeed, the second error — the use of the letter "a" in "affect" — provides no support for the majority's alternative "interpretation" of the contract. In this context, neither the word "affect" nor the word "affective" makes sense in this context (see Merriam-Webster's Collegiate Dictionary, at 19). Accordingly, whichever interpretation (or rewriting) of the agreement, is adopted, the "a" should be read as an "e." Thus, the majority's entire position is based on nothing more than the extraneous "the" in the sentence in question.